UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

DESTINY  HOFFMAN,           )
*et al.*                    )
                Plaintiffs, )
                            )
        vs.                 )        No. 4:14-cv-00012-SEB-TAB
                            )
SUSAN  KNOEBEL,             )
*et al.*                    )
                Defendants. )
                            )
                            )

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF JAMES BENNETT

This cause is before the Court on Defendants' "Motion for Summary Judgment as to James Bennett's Claims Only" [Docket No. 159], filed on April 26, 2016. For the reasons detailed below, Defendants' Motion for Summary Judgment as to Plaintiff James Bennett is GRANTED.

## Factual Background

In March of 2011, Plaintiff James Bennett was convicted of felony drug offenses in the Clark Circuit Court in Clark County, Indiana. On December 21, 2011, he received a twenty-year fixed term of imprisonment to be served within the Indiana Department of Corrections, with eight years suspended to strict probation.  Immediately following his sentencing hearing, Bennett entered the Clark County Jail to begin serving his time.

1

Fourteen months later, on March 5, 2013, Judge Jerome Jacobi of Clark Circuit Court No. 2 approved an "Agreed Sentence Modification" ordering that "Defendant's sentence shall be modified so that he may serve the remaining portion of his executed sentence in the Clark County Work Release Center." See Defs.' Ex. D. Three days thereafter, Bennett was transferred from the Clark County Jail to the Clark County Work Release Center and began participating in the Clark County Work Release Program. In connection with that program, he signed the "Conditions of the Clark County Work Release Program" ("the Conditions Contract") and an Acknowledgment Letter signifying that he had received and was responsible for reading a copy the Work Release Participant Handbook ("the Handbook"). Defs.' Exs. E, G.

Read together, the Conditions Contract and the Handbook set out the rules, regulations, policies, and procedures for participants of the Work Release Program. Included therein were directives that all participants were required to adhere to a strict schedule regarding their whereabouts and movements and a notice that participants would be charged certain fees as part of the Work Release Program, which financial obligations were to be paid by the participants in a timely fashion. *Id.* The documents also identified the possible sanctions and punishments for violations of these rules. *Id.* [1]

---

[1] The parties devote significant portions of their briefs, in block-quote fashion, to selected provisions of the Handbook, Conditions Contract, and the Clark County Work Release Operational Policy & Procedure Manual, taking the length of their filings well beyond the standard page limits set out in Local Rule 7-1. As we explain below, these precise language of these provisions is irrelevant to our ultimate determination of Plaintiff's constitutional claims. Thus, we shall not include major portions of these documents in this order. As appropriate, we have cited to the relevant document, excerpts of which are available in the record.

Five months after Bennett entered the Work Release Program, on August 8, 2013, Deputy Prosecuting Attorney Michaelia Gilbert filed with the Clark Circuit Court a Petition to Revoke his continued participation. The Petition alleged that on August 7, 2013, Bennett "[f]ailed to follow the rules of the Work Release Program as instructed by staff." Defs.' Ex. C. Specifically, the Supervision Report attached to the Petition to Revoke explained the basis for Bennett's revocation:

> One or more unaccounted for hours of release time[:] On August 7, 2013, Bennett was scheduled to leave the Clark County Work Release facility at 5:30 a.m. to attend classes at Truck America Training school. Mr. Bennett did not show up to the Truck America Training Facility for classes and did not have permission to alter his schedule. Mr. Bennett has been informed before that he is to inform Clark County Work release of any changes to his schedule and all changes and/or modifications to his schedule need prior approval.
>
> Failure to pay fees[:] Mr. Bennett is currently $776.00 in arrears.

Defs.' Ex. H at ¶¶ 3–4.

On the same day the Petition was filed, Clark Circuit Senior Judge Steven Fleece issued a warrant for Bennett's arrest, charging him with "Violation of Placement in Clark County Community Corrections Work Release Program I.C. 35-38-2.6-5" and ordering his detention without bond in the Clark County Jail until such time as he could be brought "without unnecessary delay" before the court for a hearing concerning his alleged violation of Work Release Program rules. Defs.' Exs. I, J. The warrant was served promptly by a Work Release Program Security Officer on Bennett, who was escorted to

3

the Clark County Jail, where he remained detained pending a hearing on the Petition to Revoke.

Bennett remained incarcerated at the Clark County Jail for a total of seventy-four days while he awaited his hearing on the Petition to Revoke. While detained he sent numerous letters to Attorneys Stephen Beardsely and Niles Driskill, Clark County Sheriff Danny Rodden, Clark County Corrections Officer Lindon Dodd, Judges Steven Fleece and Jerome Jacobi, and Prosecuting Attorneys Jake Elder and Matthew Lemme, each asserting that he was being held unlawfully in jail and should have been arraigned within seventy-two hours after his arrest.

Not until October 21, 2013, did one of Bennett's many letters makes its way to the Clark Circuit Court, where it was docketed on the Court's Chronological Case Summary as: "Administrative Event: Court receives letter from Defendant in CCJ." Pl.'s Ex. 7 at 5. A hearing before Judge Jerome Jacobi of the Clark Circuit Court No. 2 was scheduled and conducted that same day, at the conclusion of which hearing, Judge Jacobi remanded Bennett to the custody of the Clark County Sheriff to be held without bond until his Revocation Hearing, which Judge Jacobi scheduled for December 2, 2013. Defs.' Ex. K. Bennett remained incarcerated another six weeks until December 9, 2013, when Judge Jacobi ordered him "released back to the Clark Co. Work Release Center." Defs.' Ex. L.

On February 18, 2014, Bennett commenced the present litigation, alleging that his seventy-four-day incarceration in the Clark County Jail violated his rights to due process as guaranteed by the Fifth and Fourteenth Amendments, or, in the alternative, his Eighth

Amendment protections against excessive bail and cruel and unusual punishment. See

Dkt. 171 at ¶¶ 183, 184. Plaintiff has named as Defendants the Executive Director of

Clark County Community Corrections Stephen Mason, the Deputy Director of the Work

Release Program Danielle Grissett, and the Clark County Sheriff Danny Rodden, all in

their individual and official capacities. He also named the Clark County Board of

Commissioners. *Id.* at ¶¶ 185–89.

On April 26, 2016, Defendants moved for summary judgment on each of

Bennett's claims. See Dkt. 159. The motion became fully briefed on June 29, 2016, and is

now ripe for decision.

## **<u>Legal Standard</u>**

Summary judgment is appropriate when the record shows that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party. See *id.* at 255.

However, neither the mere existence of some alleged factual dispute between the parties,

*id.* at 247, nor the existence of some metaphysical doubt as to the material facts,

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat

a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

**Discussion**

In responding to Defendants' Motion for Summary Judgment, Bennett has abandoned his claims against the Clark County Board of Commissioners as well as his Eighth Amendment claims against all Defendants. See Dkt. 184. Accordingly, remaining before us for resolution are Bennett's Fourteenth Amendment Due Process claims against Defendants Stephen Mason, Danielle Grissett, and Danny Rodden, who have been sued in both their individual and official capacities.

Defendants raise several arguments in an effort to defeat Bennett's procedural due process claims, including, *inter alia*: (1) that each Defendant lacked the requisite personal involvement in Bennett's prolonged incarceration in the Clark County Jail to give rise to their individual liability pursuant to 42 U.S.C. § 1983; (2) that Defendants Mason and Grissett also lacked any authority to affect Bennett's incarceration in the Clark County Jail following his placement there by court order, relieving them of liability for any harm emanating from Bennett's extended detention; (3) that the Clark County Jail's policy of sending daily and weekly lists of its inmates to the appropriate courts did not constitute "deliberate indifference" to Bennett's constitutional rights sufficient to hold the Sheriff's Department liable pursuant to *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690 (1978); and (4) that Bennett did not possess a constitutionally cognizable liberty interest with respect to his participation in the Work Release Program, which interest was deprived of him without due process. See Dkt. 160.

Defendants' first three arguments relate to their potential liability under 42 U.S.C. § 1983, the statutory basis for Bennett's claims. Section 1983 imposes liability on any "person" who, while acting under color of state law, violates an individual's federally protected rights. In raising a claim under this statute, a plaintiff may name a defendant in his individual or official capacity. Individual-capacity claims "seek to impose individual liability upon a government officer for actions taken under color of state law," *Hafer v. Melo*, 502 U.S. 21, 25 (1991), whereas official-capacity claims seek to impose liability on the entity for whom the officer works, *Brandom v. Holt*, 469 U.S. 464, 471 (1985). Given this difference between the involvement of the parties ultimately found responsible for Bennett's harm, separate issue arise as to personal involvement, widespread customs and policies, policymaking authorities, and causation in deciding individual-capacity and official-capacity claims.

Prior to determining which, if any, Defendant(s) might be liable for Bennett's constitutional deprivation, we must address whether his claims involved a constitutional deprivation that actually occurred. Defendants contend that Bennett did not possess a constitutionally cognizable liberty interest under the Fourteenth Amendment, arguing that there was no protected liberty interest in remaining in the Work Release Program. In the absence of a protected liberty interest, Bennett would not possess a corresponding right to a hearing or any other due process protections, rendering moot any issues of liability for such deprivations. *See Paige v. Hudson*, 341 F.3d 642 (7th Cir. 2003). We address these contentions below.

### I.        Protected Liberty Interests

Two types of protected liberty interests arise under the Fourteenth Amendment: (A) those inherent in the Due Process Clause, and (B) those created by state laws or regulations. *See Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989); *Domka v. Portage Cnty.*, 523 F.3d 776, 779–80 (7th Cir. 2008). Plaintiff claims that he possessed both and both were violated by his protracted detention. Defendants rejoin that he possessed neither.

### A.        Liberty Interests Inherent in the Due Process Clause

The Supreme Court has recognized that in certain situations inherent liberty interests arise out of the protections of the Due Process Clause. However, such situations are uniquely limited with regard to prison inmates, given that "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights'…[and]…'[a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction.'" *Domka*, 523 F.3d at 780–81 (quoting *Sandin v. Conner*, 515 U.S. 472, 485 (1995) and *McKune v Lile*, 536 U.S. 24, 37 (2002)). Accordingly, the Due Process Clause confers liberty interests upon lawfully incarcerated inmates only in those limited situations where the alleged infringement of those rights extends beyond the normal scope of the inmate's sentence. *Sandin*, 515 U.S. at 479 n. 4.

In this regard, the Supreme Court has previously ruled that a prisoner who is institutionally confined does not possess an inherent liberty interest in being housed in a

particular facility within a state's prison system, nor does he possess a liberty interest that would allow him to avoid temporary placement in solitary confinement. *Sandin*, 515 U.S. at 487; *Meachum v. Fano*, 427 U.S. 215, 225 (1976). Moreover, the Seventh Circuit has held that "a transfer to another prison, even to one with a more restrictive environment, is not a further deprivation of an inmate's liberty under the Due Process Clause itself because the prisoner could have been initially placed in a more restrictive institution, so a transfer does not fall outside the expected scope of the sentence." *Whitford v. Boglino*, 63 F.3d 527, 532 (7th Cir. 1995).

However, once an inmate has been released from institutional confinement, the Due Process Clause does confer upon him certain liberty interests allowing him at least to remain free from detention and outside the prison's walls. "[T]he dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest [is] the fact of release from incarceration." *Paige v. Hudson*, 234 F. Supp. 2d 893, 901 (N.D. Ind. 2002), *aff'd,* 341 F.3d 642 (7th Cir. 2003) (quoting *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995), *aff'd,* 520 U.S. 143, (1997)). According to Supreme Court precedent, probationers, parolees, and pre-parolees whose status regarding detention is equivalent to parolees, all have inherent liberty interests in retaining their post-release status. *See Young v. Harper*, 520 U.S. 143, 147 (1997) (pre-parole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (probation); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (parole). Likewise, the Seventh Circuit has ruled that a probationer on home detention

has an inherent Due Process liberty interest in remaining at home as opposed to being incarcerated. *See Paige v. Hudson*, 341 F.3d 642, 643 (7th Cir. 2003).

Less clear is the interest and status of an inmate participating in a work-release program. While neither the Supreme Court nor the Seventh Circuit has directly addressed this issue, the Seventh Circuit has indicated that the unique circumstances of work-release programs place participants somewhere on the spectrum between prisoners serving out their sentences in low security confinement and probationers and parolees reestablishing their lives in relative freedom in the outside community. *See Domka*, 523 F.3d at 781 n.3.

The analysis undertaken by our Circuit is a fact-specific determination of whether a work-release program offers sufficient freedom to its participants as would confer upon them an inherent liberty interest in remaining in the program under the Due Process Clause. *See e.g., White v. Steuben Cty., Ind.*, 2011 WL 4496504, at *7 (N.D. Ind. Sept. 27, 2011). The question we must answer, then, is "whether being removed from [the work-release] program into jail is a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty…." *Paige*, 341 F.3d 642 (citing *Sandin*, 515 U.S. at 483). In making this determination, the relevant considerations are: "where the inmate is housed; the restrictions on his freedom, movement, and employment; and his overall ability to live a life without the incidents of imprisonment." *White*, 2011 WL 4496504, at *7 (citing *Domka*, 523 F.3d at 781).

11

A review of the terms, restrictions, and overall nature of the Clark County Work Release Program makes clear that Bennett's return from the Work Release Center to the Clark County Jail did not constitute a sufficiently significant incremental reduction in freedom to be regarded as a deprivation of liberty under the Due Process Clause.

To elaborate: while in the Work Release Program, Bennett was required to abide by a strict weekly schedule which was tailored to his particular situation and overseen by his Case Manager. See Participant Handbook, Dkt. 161-6 at 4. If Bennett failed to properly follow the required schedule procedures each week, he became subject to disciplinary action and was not allowed to leave the Work Release Center. *Id.* at 17. In addition, strict controls were placed on his movements, both inside and outside of the Work Release Center. He was required to secure staff permission before entering or exiting the building and to sign in and out at security desk each time he left the facility. *Id.* The work-release facility was located in the same building as the Clark County Jail, and when entering, Bennett had to pass through three locked doors, entry to which was provided via an intercom contact with the Sheriff's Office, after providing his name and bed number. *Id.* at 16. While housed in the Work Release Center, he was not allowed to possess a cellular phone, matches, lighters, or any tobacco products, beyond "Door 1." *Id.* at 19. Once inside the Work Release Center, he was required to obtain permission to leave his housing or laundry area and to cross into any red or yellow restricted areas; other areas, such as the "Administrative Area" remained entirely off-limits to him. *Id.* at 16–17, 19.

As a work-release participant, Bennett was also subject to randomized warrantless searches and seizures extending to both his person and his property. A search of Bennett's person was conducted each time he entered the facility, involving the removal of his shoes and socks for inspection, and any personal belongings he brought into the facility were also checked. *Id.* at 18. In addition, Security Officers were authorized to conduct K-9 unit searches, pat down searches, bed searches, locker searches, Alco-Sensors, and urine drug tests of participants at "any time inside or outside the facility" *Id.* at 18, 23.

Other controls within the facility included, *inter alia¸* keeping one's living unit and bunk area in compliance with specific guidelines, not possessing more than $20 at a time, not borrowing clothing from another participant, or wearing jewelry, large belt buckles, or maroon-colored shirts, remaining in one's bunk without talking during mandatory quiet time, and complying with a strict dress code and hygiene regimen. *Id.* at 14–19.

When Bennett was permitted to leave the facility, his time away was strictly scheduled and monitored. His travel was, in fact, extremely limited. Bennett was authorized to travel only to and from his place of employment, unless an appointment requiring him to be elsewhere had been previously authorized by his Case Manager. *Id.* at 17. If at an approved location outside the Work Release Center, Bennett was required to secure permission from the Center's security desk prior to changing his location and then to report his return to the original location. *Id.* at 14. For example, while at work, if

Bennett wished to "go[] on a meal break," he was required to call the security desk before leaving his job location to get permission to be elsewhere and then call back upon his return to work. *Id.* As the Program Handbook stated: "Work release Staff shall know of [all participants'] whereabouts at all times." *Id.* at 17. Moreover, a failure to return to the facility within one hour of the allotted "outside" time or failing to account for any time periods outside the facility was punishable through sanctions including loss of earned good-time credits, reductions in rewards levels, restrictions of privileges, and restitution for any amount of loss. *Id.* at 29.

Bennett's ability to reestablish connections in the outside community while participating in the Work Release Program remained virtually nonexistent due to the many limitations placed on him by the Program. Even with regard to family, visitors were not allowed to have contact with participants at the Center. Through good conduct and compliance with program rules, participants were allowed to achieve a "reward level" status that would make possible passes allowing them to visit family outside of the Center, but such passes were limited in number and duration and required pre-approval by the participant's Case Manager, and the prompt return by the participant to the Center, where he would be required to submit to a drug test. *Id.* at 16.

Taken together, these restrictions make clear that, unlike a post-release probationer or parolee, Bennett was not permitted to live free of the typical restrictions associated with imprisonment; his participation in the Work Release Program entailed his being "a prisoner serving a portion of his confinement in a different location from prison." *See*

14

*Domka*, 523 F.3d at 781 n. 3 (noting "that between the constant electronic monitoring, the fact that he was not allowed to leave his home except to go to work or for other pre-approved reasons, the frequent Sobrietor tests, etc., [the work-release participant could] appropriately be characterized as a prisoner serving a portion of his confinement in a different location from prison.") (internal quote omitted). Thus, his transfer from the Work Release Center to the Clark County Jail did not constitute "a sufficiently large incremental reduction in freedom" to give rise to a cognizable deprivation of an inherent liberty interest under the Due Process Clause when he was removed from the program and placed back in jail. *Paige*, 341 F.3d at 643.

### B.    State-Created Liberty Interests

The Supreme Court has also recognized that in the absence of an inherent liberty interest, "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995).

Bennett contends that the State created a protected liberty interest in his remaining in the Work Release Program through enactment of the provisions of the Clark County Work Release Participant Handbook, the Clark County Conditions of Work Release, the Clark County Work Release Operational Policy & Procedure Manual, and Ind. Code § 35-38-2.6-5. He maintains that these promulgations provided him the opportunity to request a hearing before an Administrative Hearing Board to pass on any accusations of a rules violation, followed by a hearing before his sentencing court prior to his removal from the Program. Pl.'s Resp. at 23–25.

Defendants rejoin that Bennett's contention misconstrues the legal import of the provisions of the Handbook, the Conditions Contract, and the Policy & Procedure Manual on which he relies. They are, Defendants argue, inapplicable to Bennett because his violations (failing to account for his time and failure make payment of fees) were "Level 1/Class A offenses," which, pursuant to the explicit terms of the Handbook, are sanctionable without necessity of an Administrative Hearing. Defs.' Reply at 6. Defendants further contend that, similar to the holding in the Northern District of Indiana case, *White v. Steuben Cty., Ind.*, 2011 WL 4496504 at *4 (N.D. Ind. Sept. 27, 2011), the statutory language found at Ind. Code § 35-38-2.6-5 does not apply to Bennett because he was not placed "directly" into the Work Release Program at the time of his sentencing. *Id.* at 10.

We need not delve into an analysis of the appropriate scope and application of the Handbook or the Indiana Code reference, given that Bennett's § 1983 claim asserts only procedural due process violations under the Fourteenth Amendment. Not every state-created right creates a cognizable liberty interest under the Fourteenth Amendment. *See Thielman v. Leean*, 282 F.3d 478, 482 (7th Cir. 2002) (citing *Sandin*, 515 U.S. at 483). Even if we were to hold that the provisions of the Handbook as well as the Indiana Code provision are applicable to Bennett so as to confer on him a right to one or more hearings prior to his removal from the work-release program, it does not necessarily follow that these state-conferred rights give rise to a cognizable liberty interest under the Fourteenth

16

Amendment. *Id.* Having determined that no such Fourteenth Amendment right exists

here, there is no need to further discuss the provisions' scope and application. [2]

Bennett's focus on the "discretionary" aspects of the above-referenced guidelines

and statutes is thus misplaced. See Pl.'s Resp. at 23 (contending that the state created a

protected liberty interest "by placing substantive limitations on official discretion")

(quoting *Smith v. Stoner*, 594 F. Supp. 1091, 1105 (N.D. Ind. 1984)). Prior to the

Supreme Court's decision in *Sandin*, in order to determine whether a state-conferred right

was cognizable under the Fourteenth Amendment, courts examined the language of the

guidelines, regulations, and state laws at issue to determine whether they contained

"mandatory language" which "created an enforceable expectation that the state would

produce a particular outcome with respect to the prisoner's conditions of confinement."

*Sandin*, 515 U.S. 472–73 (citing *Hewitt v. Helms*, 459 U.S. 460 (1983)). But the Court's

approach in *Sandin* shifted the analysis, eschewing a focus on the language of the

particular regulations at issue, which would implicitly encourage prisoners to comb

through prison guidelines, regulations, and even state statutes in search of mandatory

---

[2] Neither do we address the merits of any a state-law cause of action which Bennet may be entitled to assert under the Handbook or §35-38-2.6-5 based on the lack of his being granted a hearing prior to his transfer to the Clark County Jail. Bennett has raised only constitutional claims pursuant to 42 U.S.C. § 1983 in this lawsuit, which necessarily limits the scope of our review in this order. That said, our ruling should not be viewed as a lack of concern over the facts underlying Bennett's claims. His inability to garner any response from jail officials to his numerous requests so that he might challenge his incarceration in a timely way is at best unfair, if true. Custodians who manage penal institutions are charged with maintaining an ongoing vigilance so that no prisoner under their care gets lost in the shuffle. Our docket reflects a number of related claims by Plaintiffs against the Clark County Jail, which present different fact patterns; we address here only the constitutional question presented by Bennett: whether, as a prisoner serving out his sentence in a work-release center, he was entitled to Fourteenth Amendment due process protections prior to his transfer to the Clark County Jail.

language on which to base entitlements to various state-conferred privileges. 515 U.S. at 481. The Supreme Court noted that by drawing negative inferences from such mandatory directives, courts "create[] disincentives for states to codify prison management procedures in the interest of uniform treatment" and "le[a]d to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.*

Given this shift in analysis handed down by the *Sandin* Court, though state law may still create constitutionally cognizable liberty interests, lower courts are to focus less on the language of specific regulations and more on "the nature of the deprivation." 515 U.S. at 483–84. Under the *Sandin* doctrine, the Court ruled that state-created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483 (internal citations omitted).

Lower courts have interpreted the phrase "in relation to the ordinary incidents of prison life" to mean, under *Sandin*, that the appropriate comparison is not between the prisoner's conditions of confinement before and after the alleged deprivation, but rather between the prisoner's post-deprivation liberties and the liberties typically associated with incarceration. *See e.g., Hinton v. Well*s, 2006 WL 3192381, at *4 (W.D. Wis. Nov. 1, 2006). Accordingly, in this case before us, which involves an inmate's removal from a

work-release program, we must ask "whether [his] removal was atypical or significant when compared to the experience of the large number of prisoners who spend the duration of their sentences in prison." *White*, 2011 WL 4496504, at \*10 (citing *Hinton*, 2006 WL 3192381 at \*4)). Given that state-jail inmates typically serve out their sentences in institutional confinement, the exception to which is the opportunity, to some, to serve a portion of their sentences in a work-release program, courts within (and some outside) our Circuit have consistently held that a jail inmate does not enjoy a state-created liberty interest in participating in a work-release program. *See e.g., Asquith v. Dep't of Corrections*, 186 F.3d 407, 412 (3d Cir. 1999); *Dominique v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996); *Calendar v. Sioux City Residential Treatment Facility*¸ 88 F.3d 666, 669 (8th Cir. 1996); *White,* 2011 WL 4496504 at \*4 (N.D. Ind. Sept. 27, 2011); *Hinton v. Well*s, 2006 WL 3192381, at \*4 (W.D. Wis. Nov. 1, 2006); *Hamilton v. Peters*, 919 F. Supp. 1168, 1172 (N.D. Ill. 1996).

We see no reason to depart from this analysis here. Bennett has failed to identify any hardship endured by him during his seventy-four-day incarceration in the Clark County Jail which could be characterized as "atypical" or "significant" when compared to the normal experience of a prisoners spending the entirety of their sentences in institutional confinement. As such, he has failed to establish that he possessed a state-created liberty interest in his continued participation in the work-release program such that he was entitled to receive due process protections prior to his removal therefrom.

**Conclusion**

Because Bennett, as a prisoner serving out his executed sentence in the Clark County Work Release Center, did not possess an inherent or state-created liberty interest in remaining in the Clark County Work Release Program, he cannot maintain a cognizable Fourteenth Amendment procedural due process claim based on his temporary removal from the Program and placement in the Clark County Jail. Given his inability to maintain his claim pursuant to 42 U.S.C. § 1983, we need not determine which Defendant(s), if any, may have been held liable, and in what capacity, for his alleged constitutional deprivation. Further, because Bennett has abandoned his Eighth Amendment claims of cruel and unusual punishment, Defendants are entitled to summary judgment on all of Bennett's claims. We therefore GRANT Defendants' Motion for Summary Judgment [Docket No. 159] and hereby DISMISS James Bennett's claims.


IT IS SO ORDERED.


Date:   03/17/2017

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

James Michael Bolus, Jr.
JAMES M. BOLUS, JR. P.S.C.
bo@boluslaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

Whitney Elizabeth Wood
KIGHTLINGER & GRAY, LLP-New Albany
wwood@k-glaw.com

Elizabeth A. Knight
KNIGHT HOPPE KURNIK & KNIGHT LTD (Schererville)
eknight@khkklaw.com

Joseph W. Smith
KNIGHT HOPPE KURNIK & KNIGHT LTD (Schererville)
jsmith@khkklaw.com

Brian P. Butler
LAW OFFICE OF BRIAN BUTLER
brian.butleresq@yahoo.com

Michael A. Augustus
MICHAEL A. AUGUSTUS, PSC
mike@boluslaw.com

David A. Arthur
OFFICE OF THE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Brennan  Soergel
SOERGEL LAW OFFICE PLLC
brennan@boluslaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com