UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| DESTINY  HOFFMAN On behalf of themselves and on behalf of others similarly situated, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) | No. 4:14-cv-00012-SEB-TAB |
| | ) | |
| vs. | ) | |
| | ) | |
| SUSAN  KNOEBEL, *et al.* | ) ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on motions for summary judgment filed by four Defendants: Susan Knoebel [Docket No. 225], Jeremy Snelling [Docket No. 225], Josh Seybold [Docket No. 230], and Clark County Sheriff Danny Rodden [Docket No. 224]. For the reasons detailed below, we <u>GRANT</u> these motions, ruling in all respects in Defendants' favor.

**<u>Background</u>**

This case calls into question the legality of various practices of the Clark County Drug Treatment Court ("DTC") vis-à-vis various participants in the DTC's Program from 2011 to 2013.

**Establishment and Certification of the DTC**

The DTC was established by the Clark Superior Court in 2002 when it was certified as a "problem solving court" by the Indiana Judicial Center.  As a drug-related problem-solving court, the DTC was designed to "focus[] on addressing the substance abuse issues of defendants or juveniles in the criminal justice system by: (1) bringing together substance abuse rehabilitation professionals, local social programs, and intensive judicial monitoring; and (2) linking eligible defendants or juveniles to individually tailored programs or services."  Ind. Code at § 33-23-16-5.

Once certified, the DTC operated out of Clark Superior Court 2 from 2002 until 2012, at which time the Clark County courts were unified resulting in Superior Court 2 becoming Circuit Court 2.  Judge Jerome Jacobi, who had been elected to Superior Court 2 in 2008, became the presiding judge of Clark Circuit Court 2 and also became "Supervising Judge" for the DTC, which vested in him "ultimate responsibility" for the problem-solving court.  *See* Ind. Prob. Solving Ct. Rule 3, found at https://www.in.gov/judiciary/pscourts/files/pscourts-psc-rules.pdf (last visited July 12, 2017).

As Supervising Judge, Judge Jacobi was authorized by statute to "take steps necessary to carry out the functions of the problem solving court, including the following: (1) Hiring employees as needed to perform the required functions of the problem solving court. (2) Establishing policies and procedures for the problem solving court. (3)

2

Adopting local court rules as necessary for the problem solving court." *Id.* at § 33-23-16-21.

Judge Jacobi hired Defendant Susan Knoebel to serve as his chief probation officer in Circuit Court 2 and Director of the DTC Program. He also hired Defendant Jeremy Snelling to serve as his bailiff for Clark Circuit Court 2 and a "field officer" for the DTC. Neither "director" nor "field officer" is a defined position under the Indiana Problem Solving Court Rules as promulgated by the Indiana Judicial Center. But, according to Knoebel, as director of the DTC, she was charged with administrative oversight of the program, which entailed supervising the DTC case managers. Knoebel Decl. ¶ 3.[1] She did not, however, have hiring or firing authority nor could she unilaterally promulgate policies or procedures for the DTC, as those powers remained with Judge Jacobi as the supervising judge of the court. *Id.* Jeremy Snelling reports that when Judge Jacobi hired him as his bailiff, he was told that he had the authority to make arrests within the courthouse and that, in addition to his typical bailiff duties, he would be a member of the DTC Treatment Team as a field officer, which role entailed, among other things, conducting home inspections and curfew compliance checks and "escorting"

---

[1] A similar position of "Coordinator" is defined under the Indiana Judicial Center's Problem-Solving Court Rules as a "problem-solving court team member responsible for the administration, management and coordination of problem-solving court services and operations, including overseeing problem-solving court staff activities, ensuring the court's compliance with the problem-solving court statutes and rules, developing problem-solving court policies and procedures, managing service provider contracts and team member memoranda of understanding, managing program grants, facilitating team meetings, and serving as a liaison to local service providers and community groups." See Ind. Prob. Solv. Ct. R. 3, found at https://www.in.gov/judiciary/pscourts/files/pscourts-psc-rules.pdf. (last visited July 12, 2017).

DTC participants who were subject to arrest warrants to the Clark County Jail.  Snelling Decl. ¶¶ 4, 5, 8.

Defendant Josh Seybold and Jessie McDowell, who was later replaced by Iris Rubadue (neither McDowell nor Rubadue has been named as a Defendant in this action), were hired as case managers for the DTC participants.  The Indiana Problem-Solving Court Rules define a case manager as "a problem-solving court team member responsible for the case management of problem-solving court participants and case management files, which may include administering a risk and needs assessment, substance abuse and mental health screening, referral to treatment and ancillary services; monitoring participant compliance with the participation agreement, case management plan and other applicable agreements; and providing participant progress and compliance information to the problem-solving court team."  Ind. Prob. Solv. Ct. Rule 3.  The remainder of the DTC Staffing Committee included Magistrate William Dawkins, a representative of the prosecutor's office, a representative of the public defender's office, mental health and substance abuse service providers, halfway house directors, and law enforcement representatives.

**Operations of the DTC**

The DTC was structured to provide certain criminal defendants in Clark Circuit Court 2 who had pled guilty to drug-related felonies the opportunity to opt into the DTC Program as an alternative to incarceration.  In such circumstances, the defendant would execute a Drug Court Agreement approved by Judge Jacobi and the Indiana Judicial

Center, which explained that in exchange for agreeing to enter the DTC Program the

Clark Circuit Court would defer entering a judgment of conviction against him/her and

instead would impose on the participant certain conditions and limitations established for

the DTC Program.  Knoebel Decl. ¶ 7, Ex. A.  If a participant successfully completed the

DTC Program, the State would dismiss with prejudice the criminal charges to which

he/she had pled guilty.  *Id.*  If, however, the court determined that the person had violated

the conditions of the DTC, as prescribed in the Drug Court Agreement and the DTC

Participant Handbook, participation in the DTC Program would be terminated (following

a "due process hearing on Petition to Terminate"), a judgment of conviction would be

entered, and a sentenced would be imposed pursuant to the plea agreement based on the

offenses of conviction.  *Id.*  Typically, following the execution of these plea and drug

court agreements, the defendants' attorneys would withdraw their representation from the

cases.

Upon entry into the DTC Program, each participant was assigned to one of the two

DTC case managers, who prepared an individualized treatment plan designed to aid in his

or her substance abuse recovery.  These plans typically required, *inter alia*, that a

participant obtain treatment from a DTC-approved provider, attend self-help meetings,

and maintain employment.  The DTC also approved the participant's living arrangement,

which, depending on the particular participant's circumstances, would be a private

residence, a treatment facility, or a group home such as a halfway house.  While

participating in the DTC Program, participants also were subject to various conditions

and restrictions comparable to those imposed on probationers, such as unannounced home visits and random drug screens, in addition to heightened levels of judicial oversight.

As part of such judicial oversight, the DTC Staffing Committee, usually consisting of the presiding judge (either Judge Jacobi or Magistrate Judge Dawkins or both), DTC Director Knoebel, the DTC case managers, an administrative assistant, a deputy prosecutor, and a defense attorney, held weekly meetings each Thursday at noon to discuss the participants' progress and behavior. [2]  During these weekly meetings, case managers presented for discussion reports on the progress of each participant who was scheduled to appear at a status hearing that same afternoon.  Discussions often covered issues related to possible sanctions for noncompliant behavior such as testing positive or diluting a urine screen, failing to report or attend a group meeting, failing to gain or keep employment, being arrested, or failing to comply with other conditions imposed by the participant's individualized treatment plan.  Knoebel Decl. ¶ 10.  Tentative decisions regarding the appropriate sanctions or behavior modifications for particular rules infractions were generally reached by consensus; however, certain committee members, including Case Managers Josh Seybold and Iris Rubadue and Director Susan Knoebel, sometimes recommended sanctions, leaving the final decision to the judge presiding at

---

[2] Defendants have indicated that attendance at the weekly staffing meetings would vary from time to time and would sometimes include Bailiff Jeremy Snelling, some of the various treatment providers, or a judge who might be presiding *pro tem* over the DTC docket that week. See Dkt. 228 at 5.

the status hearing later that day. *Id.* ¶ 11.[3] Sanctions typically included demoting a participant to a lower phase in the Program, requiring community service, assigning the writing of a reflective essay, increasing the frequency of status hearings, imposing "short-term jail stays," or terminations from the Program. *Id.* ¶ 9.

Following the Staffing Committee meetings, the DTC conducted the status hearings with the participants. The presiding judge, Director Susan Knoebel, Bailiff Jeremy Snelling, the DTC participants, and various Clark County Jail officers also attended these hearings; however, neither the Staffing Committee attorneys nor any other attorneys were present during the DTC proceedings. During the hearings, the presiding judge heard from the participants, discussed their progress and alleged infractions, and, when necessary, issued sanctions, which could include ordering the remand of certain participants to the custody of the Clark County Sheriff to be detained in the Clark County Jail. *See* Dkt. 231 at 13.

In certain instances, if a participant failed a drug test, the presiding judge imposed a sanction on the participant that involved a "short-term jail stay," in which, as the judge explained to the participant, the detention was for a specific, limited period of time, typically 48 or 72 hours. In other instances, typically involving second or third infractions, the judge ordered a longer period of detention—i.e., up to 30 days in jail. On other occasions, the judge imposed a 48-hour or 72-hour sanction, which generated a

---

[3] Defendants maintain that "[o]n multiple occasions Judge Jacobi or Magistrate Dawkins issued orders that deviated from the staffing team's recommendation." Dkt. 231 at 6 (citing Knoebel Decl. ¶ 11).

Bond Notice to Sheriff ordering detention of the participant "pending placement," "pending staffing," "pending evaluation," or simply "until further order of the court." *See e.g.*, Rodden Exs. 37–41 (in re: Plaintiff Santiago).

If a participant were jailed "pending staffing" or "pending evaluation," the Sheriff and DTC Staff understood that detention would occur in the Clark County Jail until such time as the case could be discussed by the Staffing Committee the following week. Thereafter the participant was returned to court for another status hearing. More common was the practice of jailing a participant "pending placement," which resulted in the participant being taken into custody and held until the case manager could arrange placement at a DTC-approved residential treatment facility or halfway house.

Plaintiffs maintain that at no time during these DTC status hearings in which they received "short-term jail stay" sanctions were they ever given written notice of the specific allegations against them or appointed counsel or provided any advisement of their rights, including the right to counsel.

Moreover, due to a variety of circumstances, including increases in caseloads without corresponding increases in resources as well as restrictions imposed by certain treatment providers and halfway houses, participants who had been subject to short-term detentions often remained incarcerated at the Clark County Jail for extended periods of time while the case managers searched for alternative facilities and available halfway houses in which to place them. Notwithstanding their prolonged incarceration, Judge Jacobi viewed some participants as "better off" in the Clark County Jail than they would

have been on the streets, justifying their continued custody for indefinite periods of time to allow the case managers time to locate potential placements. Jacobi Dep. at 112–14. On other occasions, participants were held at the jail pending staffing evaluation without scheduling either a status conference or a court appearance when the presiding judge determined at the staffing committee meeting that no new developments warranted discussion regarding that participant's progress in the Program.

As a result, many participants in the DTC Program, including those who were told they would be serving brief, 48-hour periods of detention languished in the Clark County Jail for extended and indefinite periods of time without knowing when they might be released or brought before the court, or, in some cases, the reason they were being held much longer than they had been told by the DTC presiding judge.

Because these detainees were unrepresented by counsel at the DTC status hearings when they received their sanctions, they were often left to writing letters to the judges, to DTC Director Knoebel, and to their DTC case managers inquiring as to when they would be released. Many also conferred with the Clark County Jail guards and in particular with Officer Lindon Dodd, who was the Sheriff's Department Court Liaison, regarding the length of their incarceration. They reportedly received varied responses, usually being told by the guards that the jail was waiting for instructions from the DTC or that DTC was still searching for placement for them at an approved treatment facility. The duration of their incarceration was at best unpredictable, and almost always unknown. Some participants remained in custody for a matter of weeks before being brought before

the DTC, only to be remanded to custody pending further evaluation.  Others were detained for months before finally receiving placement at a DTC-approved facility or halfway house.  Still others remained in the Clark County Jail for many months, only to be released on their own recognizance upon their promise that they would report to the DTC for their next scheduled status hearing.  The determinations of the duration of detention of Program participants were random, inconsistent, happenstance, arbitrary, capricious, negligent and unjust.  It was a wholly indefensible system.

During the period from 2012 to 2013, increasing numbers of DTC participants began to abscond from the Program, failing to report to their meetings, treatment, and status hearings.  In response, the DTC judges issued increased numbers of arrest warrants based on the participants' failures to appear.  Director Susan Knoebel and Bailiff Jeremy Snelling have testified that Judge Jacobi directed them to attempt to locate those participants who had absconded from the program for whom arrest warrants had been issued and to either voluntarily escort them back to the Clark County Jail or to call local law enforcement officers to execute the arrest warrants and take them into custody. Knoebel Decl. ¶ 17; Snelling Decl. ¶ 9.  Pursuant to Judge Jacobi's order, Knoebel and Snelling located and transported at least five absconders to the Clark County Jail during this twelve-month period of time.

### Termination of DTC Operations

In August 2013, two defense attorneys serving as members of the Staffing Committee raised various due process concerns with Judge Jacobi regarding the DTC's

sanctions procedures. Judge Jacobi responded, commenting that "the due process 'dog' can never wag the 'tail'" of the DTC's primary functions. *See* Dkt. 232-6. Magistrate Dawkins reportedly approached Clark Circuit Court Chief Judge Vicki Carmichael to express the same concerns. Chief Judge Carmichael discussed these issues with Judge Jacobi, who repeated his belief that the DTC procedures allowing the imposition of immediate sanctions including incarceration were not constitutionally infirmed. In November 2013, DTC Case Managers Josh Seybold and Iris Rubadue independently approached Chief Judge Carmichael to express their concerns regarding the operations of the DTC, with specific reference to participants being jailed without due process protections.

Chief Judge Carmichael contacted the Indiana Judicial Center regarding DTC practices, and, in early 2014, the IJC suspended operations of the DTC. Chief Judge Carmichael was placed in charge of the DTC to allow the current participants to complete the program, and, in June 2015, the DTC officially ceased all operations.

In conjunction with the IJC's investigation into the DTC, the Indiana Commission on Judicial Qualifications undertook an investigation of Judge Jacobi's alleged violations of the Indiana Code of Judicial Conduct in supervising the DTC. In March 2015, the Commission concluded its investigation following Jacobi's removal from office and his

agreement not to seek or accept any judicial office or position in the future.  *See* Dkt. 233-4.[4]

### The Instant Litigation

On February 18, 2014, eight Plaintiffs commenced this litigation against the following Defendants: Judge Jerome Jacobi, DTC Director Susan Knoebel, Bailiff Jeremy Snelling, Chief Probation Officer Henry Ford, Clark County Work Release Director Danielle Grissett, Executive Director of Clark County Community Corrections Stephen Mason, the Clark County Board of Commissioners, and certain unknown Circuit Court employees (later represented by Circuit Court 3 Clerk Whitney Newton), alleging various violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution.  Dkt. 1 ¶¶ 18–26.  Plaintiffs' Complaint has twice been amended: once on April 8, 2014 to add eight new plaintiffs and one new defendant, *see* dkt. 17 ¶ 34, and again on March 3, 2016 to add five more plaintiffs, *see* dkt. 171, bringing the total number of Plaintiffs in this action to twenty-one and the total number of Defendants to nine.

During the course of this litigation, we have ruled on and issued the dismissal of the official-capacity claims for declaratory and injunctive relief against Judge Jacobi on grounds of mootness, given his resignation from office and stipulation not to accept any judicial office in the future.  *See* Dkt. 158.  We have also ruled in favor of Defendants

---

[4] Both Director Susan Knoebel's and Bailiff Jeremy Snelling's employment with the DTC and with Clark Circuit Court were terminated in January and February 2014, respectively.  Knoebel Decl. ¶ 36; Snelling Decl. ¶ 26.

Henry Ford, Susan Knoebel, Jeremy Snelling, Josh Seybold, and the Clark County Board of Commissioners with regard to Plaintiffs' claims against them in their official capacities, finding that these Defendants either lacked final policymaking authority over the DTC or were state-actors subject to suit in their official capacities only for prospective injunctive relief, which became moot when the DTC officially ended operations in June 2015. *See* Dkt. 284. Separately, we have ruled in favor of Defendants Whitney Newton, Danielle Grissett, and Stephen Mason, on the claims made by Plaintiffs Lee Spaulding, James Bennett, and Jesse Hash. *See* Dkts. 164, 266, 267, 283.

This entry addresses seventeen of the twenty-one Plaintiffs' remaining claims against Defendants Susan Knoebel, Jeremy Snelling, Josh Seybold, and Clark County Sheriff Danny Rodden based on alleged violations of their Fourteenth Amendment right to due process as well as five of the twenty-one Plaintiffs' remaining claims against Defendants Snelling and Knoebel based on alleged violations of their Fourth Amendment right against unreasonable seizures. *See* Dkts. 224, 225, 230.

## Legal Analysis

### Fifth and Fourteenth Amendment Due Process Claims

Plaintiffs Amanda Campbell, Michael Campbell, Nathan Clifford, Joshua Foley Destiny Hoffman, Julia Joseph, Justin Lanham, Jason O'Connor, Jarvis Peele, Trentney Rhodes, Ashleigh Santiago (formerly known as "Ashleigh Hendricks"), Brandelyn Taylor, Katherine Tudor, Amy Tuttle, Bobby Upton, and Joanie Watson have all sued Defendants Susan Knoebel, Jeremy Snelling, and Josh Seybold in their individual

13

capacities as well as Sheriff Danny Rodden in both his individual and official capacities, alleging that during their participation in the DTC each of them was, at one time or another, unlawfully incarcerated in the Clark County Jail for periods longer than 72 hours without being afforded a hearing, notice, counsel, judicial consideration of bond, or the opportunity to hear the evidence against them, all in violation of their rights to due process under the Fourteenth Amendment. Dkt. 171 ¶¶ 168–175.[5]

Plaintiff Shane Bratcher (f/k/a Courtney Cowherd) has sued only Defendants Knoebel, Snelling, and Seybold in their individual capacities, alleging that his participation in the DTC was unduly prolonged, exceeding the sentence originally imposed on him for his offenses as well as the maximum possible length of time outlined in his Drug Court Agreement, in violation of the Fourteenth Amendment. Dkt. 171 ¶¶ 115–117.

### Fourth Amendment Claims of Unlawful Arrest

Plaintiffs Michael Campbell, Amy Bennett, Brandelyn Taylor, Robert Upton, and Ashleigh Santiago have sued Defendants Susan Knoebel and Jeremy Snelling in their individual capacities, alleging that Knoebel and Snelling unlawfully placed them under arrest without authority to do so, in violation of the Fourth Amendment. Dkt. 171 ¶¶ 192–194.

---

[5] The specific periods of incarceration endured by each of these seventeen Plaintiffs ranges from 6 to 220 days at a time and can be found in the Chronological Case Summary associated with that Plaintiff, which is located at Docket No. 58-1.

Three of these Plaintiffs—Michael Campbell, Amy Bennett, and Brandelyn Taylor—allege that after absconding from the DTC Program and being located at their respective homes by Snelling and Knoebel, who had arrived in an unmarked, county-owned cruiser wearing badges and carrying firearms, they were handcuffed by Snelling, placed in the back of the county vehicle, and transported to the Clark County Jail. *See* Dkt. 270, Exs. 58, 66, 70. They also maintain that, contrary to Knoebel's and Snelling's contention, they were not given the option to decline being "voluntarily escorted" to jail by them and waiting for local enforcement officers to arrive and place them under arrest. *Id.*

Plaintiff Robert Upton alleges that following his release from jail on July 25, 2012, he violated a no-contact order when he picked up his girlfriend from her job and drove her home. As he pulled into her driveway, a police car pulled in behind them and DTC Director Susan Knoebel exited the car accompanied by a Jeffersonville Police Officer, whom she instructed to place Upton under arrest and transport to the Clark County Jail. Upton Dep. at 40–45.

Plaintiff Ashleigh Santiago alleges that after attending a DTC Status hearing on May 16, 2013, she was sanctioned by Judge Jacobi to a short-term stay in jail for testing positive for an illicit drug known as "Kratom" and that Bailiff Jeremy Snelling placed her in handcuffs and escorted her to the Clark County Jail. Santiago Dep. at 41.

The following chart illustrates against whom each Plaintiff has raised his or her claim(s):

| Defendants<br><br>Claims | Susan Knoebel & Jeremy Snelling<br>(Individual Capacity) | Josh Seybold<br><br>(Individual Capacity) | Sheriff Rodden<br><br>(Official Capacity) |
|---|---|---|---|
| Fourteenth Amendment: Due Process | Destiny Hoffman<br>Jason O'Connor<br>Nathan Clifford<br>Josh Foley<br>Amy Tuttle<br>Amanda Campbell<br>Justin Lanham<br>Trentney Rhodes<br>Joanie Watson<br>Julia Joseph<br>Jarvis Peele<br>Katherine Tudor<br>Shane Bratcher<br>Ashleigh Santiago<br>Michael Campbell<br>Robert Upton<br>Brandelyn Taylor | Destiny Hoffman<br>Jason O'Connor<br>Nathan Clifford<br>Josh Foley<br>Amy Tuttle<br>Amanda Campbell<br>Justin Lanham<br>Trentney Rhodes<br>Joanie Watson<br>Julia Joseph<br>Jarvis Peele<br>Katherine Tudor<br>Shane Bratcher<br>Ashleigh Santiago<br>Michael Campbell<br>Robert Upton<br>Brandelyn Taylor | Destiny Hoffman<br>Jason O'Connor<br>Nathan Clifford<br>Josh Foley<br>Amy Tuttle<br>Amanda Campbell<br>Justin Lanham<br>Trentney Rhodes<br>Joanie Watson<br>Julia Joseph<br>Jarvis Peele<br>Katherine Tudor<br>--<br>Ashleigh Santiago<br>Michael Campbell<br>Robert Upton<br>Brandelyn Taylor |
| Fourth Amendment: Unlawful Arrest | Ashleigh Santiago<br>Michael Campbell<br>Robert Upton<br>Brandelyn Taylor<br>Amy Bennett | | |

Defendants Knoebel, Snelling, Seybold, and Sheriff Rodden filed motions for summary judgment on January 16, 2017.  *See* Dkts. 224, 225, 230.  These motions became fully briefed on April 28, 2017 and are now ripe for decision.

## Legal Standards for Summary Judgment

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil

Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

"However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some

17

alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## Discussion

Defendants' motions for summary judgment challenge two types of claims by Plaintiffs: (1) the due process claims by sixteen former DTC participants against Defendants Susan Knoebel, Jeremy Snelling, Josh Seybold and Sheriff Rodden, and (2) the unlawful arrest claims by five Plaintiffs against only Knoebel and Snelling.

We begin by addressing Defendants' contention that all of Plaintiffs' claims are barred by a release provision contained in Paragraph 11 of the DTC Agreements, executed by each Plaintiff upon his/her entry into the DTC Program; this passage states:

> The Defendant releases and forever discharges the complaining witness, victims, judge, prosecutor, defense counsel, police departments, drug court staff, and service providers and their respective heirs, successors and executors from any and all claims of any kind or nature whatsoever, either in law in inequity (sic), arising out of his or her arrest, participation in, or terminations from, the Drug Court Program and does expressly release and forever hold harmless from any criminal or civil action which the Defendant may have a right to bring as a result of the Defendant's arrest or participation in the Drug Treatment Court Program.

Dkt 58-1.

We have previously expressed our reservations as to the enforceability of the above-referenced provision in the related *Hendrick v. Knoebel* litigation.  There, we cited, among other reasons, the clear lack a parity between the contracting parties, the absence of specificity in the text of the alleged waiver, the fact that this provision purports to absolve the DTC's employees of liability for intentionally tortious conduct, and the fact that the DTC Program was a state activity authorized to perform a public service in accordance with Constitutional protections.  *See Hendrick¸* 2017 WL 1927729, at *1 n.3 (S.D. Ind. May 10, 2017).  In addition, without deciding the issues presented, we nonetheless noted that because the provision appears to implicate federal common law by providing a waiver of federal statutory and constitutional rights, its enforceability is unlikely, given that the Court is required to "indulge every reasonable presumption against waiver of fundamental constitutional rights."  *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

We echo those concerns here, but, as we did in *Hendrick*, we shall forego ruling directly on the enforceability of this provision, given our conclusion explicated below that the DTC Defendants are entitled to immunity from suit, under 42 U.S.C. § 1983, without regard to the clause's interpretation or enforceability.

## I.    Due Process Claims

As previously detailed, eighteen of the twenty-one Plaintiffs were former participants of the DTC Program.  With few exceptions, each pled guilty to a drug-related felony in Clark Circuit Court 2, but had his or her judgment of conviction and sentence

withheld pending placement in the DTC Program, with the assurance that, upon successful completion of the Program, the charges would be dismissed with prejudice. [6]

At some point during their respective participations in the Program seventeen of these eighteen Plaintiffs either failed or improperly diluted a drug test, failed to appear for a hearing or meeting, admitted to consuming alcohol or another prohibited substance, including illicit drugs, or violated a DTC Program or halfway house rule.[7]  Based on these violations, they were either arrested and taken immediately to the Clark County Jail, where they remained for no more than 48 hours pending a DTC hearing, or were taken directly before the DTC, where they received sanctions imposed by either Judge Jacobi, Magistrate Judge Dawkins, or the judge *pro tem*.  It is undisputed that no attorneys were ever present at these hearings to represent the participants and that in each instance where the participant was taken into custody as his or her "sanction," the time was served in the Clark County Jail.  It is likewise undisputed that each of these seventeen Plaintiffs served more than 72 hours in the Clark County Jail as a sanction

---

[6] Brandelyn Taylor entered the DTC Program after pleading guilty to Burglary, a Class B felony, in Scott Circuit Court, dkt. 171 ¶ 140, and Justin Lanham entered the DTC Program after pleading guilty to Theft, a Class D felony, in Clark Circuit Court 4, *id.* ¶ 118; each had his or her judgment of conviction and sentence withheld pending placement in the DTC Program. *Id.*

[7] Though Plaintiffs' precise infractions are not relevant to our analysis here, they can be located in their Responsive Briefs found at Docket Nos. 268–270. Plaintiff Shane Bratcher is not included in this group, given that his claim is based on what he describes to have been an unconstitutionally protracted period of participation in the DTC Program, rather than from an unlawfully extended period of incarceration in the Clark County Jail. However, because Bratcher has failed to raise any independent argument regarding his due process claim, we rule that he has waved that argument.

while awaiting further evaluation by the DTC Staffing Committee or placement at a DTC-approved treatment facility or halfway house.

Seventeen of the former DTC Program participants have brought individual-capacity suits against Defendants Susan Knoebel, Jeremy Snelling, and Josh Seybold under 42 U.S.C. § 1983, alleging deprivations of their due process rights under the Fourteenth Amendment.[8]  *See* Dkt. 171.  In addition, sixteen of those seventeen who served out their DTC sanctions in the Clark County Jail have brought both individual and official-capacity suits against Clark County Sheriff Danny Rodden.  *Id.*

### A. Individual-Capacity Claims against Knoebel, Snelling, and Seybold

Plaintiffs have sued Defendants Susan Knoebel, Jeremy Snelling, and Josh Seybold in their individual capacities for violations of their Fourteenth Amendment rights to due process, alleging that they (Plaintiffs) were unlawfully incarcerated in the Clark County Jail for periods of time exceeding 72 hours without being afforded a hearing, notice, counsel, judicial consideration of bond, or the opportunity to hear the evidence against them or cross-examine witnesses.

Plaintiffs bring these due process claims pursuant to 42 U.S.C. § 1983, which imposes liability on any person who, while acting under color of state law, violates an individual's federally-protected rights.  As we have explained previously in our rulings in

---

[8] Though Plaintiff Amy Bennett alleges to have been incarcerated in the Clark County Jail following a DTC sanctions hearing, she has raised only unlawful arrest claims against Defendant Jeremy Snelling, which we address below.

this case, a plaintiff advancing a claim under § 1983 may seek to hold a defendant liable in his or her individual capacity or in his or her official capacity.  Individual-capacity claims "seek to impose individual liability upon a government officer for actions taken under color of state law," *Hafer v. Melo*, 502 U.S. 21, 25 (1991), whereas official-capacity claims seek to impose liability on the governmental entity for whom the officer works, *Brandom v. Holt*, 469 U.S. 464, 471 (1985).

Though Plaintiffs have named Defendants Knoebel, Snelling, and Seybold in both their individual and official capacities, only the individual-capacity claims still remain. *See* Dkt. 284.  Because § 1983 does not allow a defendant to be held individually liable under a theory of *respondeat superior* or vicarious liability, a plaintiff  seeking to hold a defendant liable in his or her individual capacity must establish that the defendant was in some manner personally responsible for the plaintiff's alleged deprivation.  *See Kunh v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012) ("§ 1983 liability is premised on the wrongdoer's personal responsibility. 'An *individual* cannot be held liability in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.'") (quoting *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983)) (emphasis in original).

Here, Defendants Knoebel, Snelling, and Seybold have moved for summary judgment contending that they were not personally responsible for Plaintiffs' alleged deprivations and, therefore, cannot be held individually liable on Plaintiffs' claims. Defendants maintain that they were simply doing the bidding of Judge Jacobi as well as

the other presiding judges of the DTC and the Clark County Sheriff, each of whom was, in fact, personally responsible for Plaintiffs' alleged constitutional deprivations.

It is undisputed that Judge Jacobi as the Supervising Judge of the DTC was vested with "ultimate authority" over the DTC and its operations. Ind. Prob. Solv. Ct. R. 3. By statute, he possessed the authority to hire and fire employees, create policies and procedures, and enact local court rules for the DTC. *See* Ind. Code § 33-23-16-21. Indeed, his role as the final policymaker in this regard is further evidenced by the fact that when members of the DTC's Staffing Committee first began to have concerns regarding the lack of due process protections associated with the DTC's sanctions proceedings, they brought those concerns to Judge Jacobi, who responded that in his judgment the DTC's procedures were sufficient and thus left them unaltered.

Importantly, it was also Judge Jacobi along with the other presiding judges who made each final decision regarding a sanction for the DTC participants, and it was these *judges* who issued the court orders and sheriff's bond notices remanding the participants to the custody of the Clark County Sheriff. Thereafter, it was Clark County Sheriff Danny Rodden and his department who was responsible for overseeing the care and custody of the participants during their incarcerations in the Clark County Jail. *See* Ind. Code § 36-2-13-5(a)(7).

As Defendants correctly point out, Plaintiffs' efforts to hold Knoebel, Snelling, and Seybold individually liable as members of the DTC Staff ignore the fact that these Defendants possessed no authority over the policies and procedures of the DTC or the

23

Clark County Jail, nor were they personally responsible for the judges' final decisions regarding sanctions, the court orders and notices of bond remanding these Plaintiffs to custody, or the decisions to keep these Plaintiffs in custody following their placement in the Clark County Jail.[9]

Plaintiffs seek to hold these Defendants liable not for personally placing them or keeping them in custody without providing sufficient due process, they say, but for their "utter failure to timely take appropriate action in response to the obvious constitutional violations Plaintiffs were suffering…." *See* Dkts. 269 at 38 and 270 at 44.  More precisely, Plaintiffs contend that during their incarceration in the Clark County Jail, they each placed numerous phone calls, mailed multiple letters, and arranged for several family members to visit Knoebel, Snelling, and Seybold to convey their concerns regarding the length of their incarcerations, but, notwithstanding such clear evidence of "obvious" constitutional deprivations, these Defendants remained "deliberately indifferent" to Plaintiffs' rights by failing to respond through some investigation into the constitutionality of the DTC sanctions procedures and failing to prepare and submit a "considered report" of those findings to someone outside the direct chain of command,

---

[9] We pause to note that these Defendants, while not personal responsible for these policies and procedures, are not entirely without involvement in the circumstances that led to the DTC Program participants' incarcerations.  Among other things, Defendants Knoebel and Seybold would on occasion provide recommendations to the presiding judges regarding sanctions, file petitions to terminate participation in the DTC, and attempt to locate suitable placement at DTC-approved treatment facilitates while these participants were incarcerated in the Clark County Jail.  However, Plaintiffs have left wholly undeveloped any arguments regarding these actions.  In any event, these actions likely would be covered by quasi-judicial immunity, which typically extends to court personnel performing judicial or quasi-judicial functions such as recommending sentences.  *See e.g. Kincaid v. Vail*, 969 F.2d 594, 600 (7th Cir. 1992); *Heitz v. LaPorte Cty. Adult Probation Dept.*, 2009 WL 2413788, at *4 (N.D. Ind. Aug. 4, 2009).

such as Chief Judge Carmichael or the Indiana Judicial Center, who was empowered to intervene on behalf of Plaintiffs.  *See* Dkts. 269 at 39 and 270 at 47.[10]

Plaintiffs' argument is a novel but inappropriate and ultimately unavailing spin on the "deliberate indifference" theory of causation established by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1981).  In *City of Canton*, the Court ruled that a municipality or other local division of government may be held liable under § 1983 where its "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants."  *Id.* at 388–89.  This theory of liability was later expanded to also encompass supervisors in their individual capacities in cases where, although they did not directly participate in the alleged deprivation of rights, they knew of the violative conduct and "facilitate[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see."  *Backes v. Village of Peoria Heights, Ill.,* 662 F.3d 866, 869–70 (7th Cir. 2011) (citing *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001)).  "In other words, *supervisors* may be held liable under § 1983 for the actions of their subordinates if they acted 'either knowingly or with deliberate indifference.'"  *Freeman v. City of Milwaukee*, 994 F. Supp. 2d 957, 969 (E.D. Wis. 2014) (citing *Backes,* 662 F.3d at 870 and *Chavez,* 251 F.3d at 651).

---

[10] Plaintiffs acknowledge the fact that Defendant Josh Seybold eventually did express his concerns regarding the DTC to Chief Judge Carmichael in November 2013, but they argue that his efforts came too late, thereby prolonging their unlawful incarcerations in the Clark County Jail.

We know of no case applying this theory of individual liability to a subordinate based on actions taken by his superiors, even under circumstances when he knew or arguably should have known such supervisory actions violated the Constitution. To hold subordinates individually liable for unconstitutional conduct over which they possess no control or authority but have only knowledge plows new ground as a § 1983 theory.

Such an argument collapses under the weight of the particular circumstances of this case. Unlike in *Hanas v. Inner City Christian Outreach Inc.*, 542 F. Supp. 2d 683 (E.D. Mich. 2008), the only case on which Plaintiffs rely for this theory, the alleged unconstitutional conduct here was performed by judges whose actions were cloaked in absolute judicial immunity.[11] To hold these judges' subordinates liable for allegedly "fail[ing] to timely take appropriate action in response to [] obvious constitutional violations" committed by the judges would run counter to the principles underlying judicial immunity by essentially subjecting the judges' staff (as opposed to the judges themselves) to suit for actions taken within the judges' discretion and jurisdiction. *See Schneider v. County of Will*, 366 Fed. Appx 683, 685 (7th Cir. 2010) ("[J]ust as judges should not be subjected to lawsuits from disappointed litigants, neither should someone who acts as a judicial agent become a 'lightning rod for harassing litigation.'") (quoting

---

[11] In *Hanas,* an Eastern District of Michigan judge ruled that there were genuine issues of material fact regarding a drug court case manager's tort liability, where the case manager knew of obvious constitutional violations occurring at a faith-based treatment center in which the drug court placed participants, but failed to report those obvious violations to the drug court judges. 452 F. Supp. 2d at 699–700. The district court held that the case manager's failure to investigate and report the constitutional violations to a judge reinforced the facility's behavior by assuring it that it had the backing of the drug court, and, therefore, a material factual dispute existed as to whether her failure to act played a substantial role in the plaintiff's suffering during the period of time that began when she was notified of the obvious violations and when the drug court judges were finally notified. *Id.*

*Ashbrook v. Hoffman¸*617 F.2d 474, 476 (7th Cir. 1980)).  Accordingly, Plaintiffs'
"deliberate indifference" claims against Defendants Knoebel, Snelling, and Seybold in
their individual capacities for their alleged failure to "take appropriate action in response"
to the DTC judges' decisions, whether those decisions regarded individual sanctions or
DTC policies more generally, fail to satisfy the requirements of § 1983.

Given that there is no evidence that these DTC staff members exercised any
personal influence or individual authority over the policies or conduct of the Sheriff and
the Sheriff's Department, this conclusion applies equally with respect to Plaintiffs' claims
regarding the duration of their incarcerations at the Clark County Jail.  *See e.g., Anderson
v. Simon¸* 217 F.3d 472, 476 (7th Cir. 2001) (holding that, absent evidence that the police
were under a duty to follow a state's attorney's orders concerning the length of a
plaintiff's detention, the plaintiff had inappropriately named the prosecutor as a defendant
under § 1983); *see also Dommer v. Crawford*, 653 F.2d 289 (7th Cir. 1981).

### B. Claims against Sheriff Rodden

Sixteen Plaintiffs have also brought claims against Clark County Sheriff Danny
Rodden in his official capacity, alleging violations of their Fourteenth Amendment rights
to due process.[12]

---

[12] Though Plaintiffs' Second Amended Complaint contains allegations against Sheriff Rodden in both his individual and official capacities, in responding to Rodden's motion for summary judgment [Docket No. 224], Plaintiffs have abandoned their individual-capacity claims.  *See* Docket No. 268.

As the Supreme Court recognized in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), a suit against an officer in his official capacity "generally represent[s] only another way of pleading an action against [the] entity of which [the] officer is an agent." Accordingly, we interpret Plaintiffs' official-capacity claims as against the Clark County Sheriff's Department, a local government entity subject to suit for damages under Indiana law. *See Burton v. Lacy,* 2008 WL 187552, at *5 (S.D. Ind. 2008) ("[N]aming the Sheriff in his official capacity is the same thing as bringing suit against the Sheriff's Department.").

In order to hold the Department liable under 42 U.S.C. § 1983, Plaintiffs must show that (1) they suffered a deprivation of a federal right, (2) as a result of either an express policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the entity at issue, which (3) was the proximate cause of their injury. *See Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690 (1978) (holding that a local government is liable under § 1983 for its policies that cause constitutional deprivations); *Ienco v. City of Chi.,* 286 F.3d 994, 998 (7th Cir. 2002).

Here, Plaintiffs contend that their federal rights to due process were violated by Sheriff Rodden "when they were systematically held in jail for an indefinite period of time without a court hearing, notice, counsel, the consideration of bond, or the opportunity to hear evidence against them or cross examine witnesses." Dkt. 268 at 23.

Sheriff Rodden has moved for summary judgment contending that Plaintiffs' alleged deprivations of due process were not caused by a policy or custom of the Clark

County Sheriff's Department.  We agree with Sheriff Rodden that Plaintiffs' official-capacity claims against him fail on the third required element of a § 1983 claim—proximate cause.

These sixteen Plaintiffs seek to compare their claims to those of another Plaintiff in this litigation, Jesse Hash.  Unlike these Plaintiffs, however, Plaintiff Hash was not a participant in the DTC Program.  Rather, his claims stemmed from his arrest on August 8, 2013 for failing to appear at a July 24, 2013 court hearing.  Following his arrest, Hash was incarcerated in the Clark County Jail for sixty days before he was taken to court for his initial appearance.  As a result, Hash sued Sheriff Rodden in his official capacity alleging that his sixty-day incarceration at the Clark County Jail prior to an initial appearance violated his rights to due process as protected by the Fourteenth Amendment and Ind. Code § 35-33-7-4, which laws provide that a person arrested on the basis of a warrant must be taken "promptly" for an initial hearing, which typically means within 72 hours.  Hash claimed that his confinement at the jail was unlawfully extended beyond the 72-hour limit as a result of the Sheriff Department's constitutionally infirmed policy of sending weekly emails of its inmate roster to the Clark County Courts.

On March 24, 2017, we entered an order on Hash's claims holding that the practice of sending weekly emails to the courts containing the jail's current inmate roster was legally indistinguishable from the "will call" policies the Seventh Circuit found deliberately indifferent in *Armstrong v. Squadrito,* 152 F.3d 564 (7th Cir. 1998) and *Luck v. Rovenstine,* 168 F.3d 323 (7th Cir. 1999).  Dkt. 267.

29

In our order, we explained:

> The county sheriff is the final policymaker for county jails in Indiana, and, as such, state law places an affirmative duty on him/her "to take care of the county jail and the prisoners there." Ind. Code § 36–2–13–5(a)(7). In the cases of jail detainees arrested on a warrant, such care must extend to the statutory command that such a person "shall be taken promptly for an initial hearing before the court issuing the warrant...." Ind. Code § 35–33–7–4; see also Ind. Code § 35–33–2–2(a)(6) ("A warrant of arrest shall ... command that the person ... be arrested and brought before the court issuing the warrant, *without unnecessary delay*...."); and Hash Arrest Warrant, Dkt. 185–1 ("To the Sheriff of Clark County ... You are hereby commanded to arrest Jesse A Hash forthwith ... And for want of bail commit him to the jail of the County and *thereafter without unnecessary delay to bring him before the said court.* ") (emphasis added). Simply put, the *pro forma* emailing of the jail's inmate roster to the courts, even if the roster contains the inmates' name, warrant number, and booking date, does not satisfy the Sheriff's duties imposed on him by state law and the Constitution to ensure that detainees in his custody are not unlawfully subjected to prolonged confinement. *Armstrong*, 152 F.3d at 578 ("In a constitutional sense, how much more basic could it get—jails cannot confine people without the authority to do so."). As we have stated previously in this case, "Custodians who manage penal institutions are charged with maintaining an ongoing vigilance so that no prisoner under their care gets lost in the shuffle." Dkt. 266 at 17 n.2. A policy under which the Jail simply forwards its inmate roster to the courts, without more, operates with deliberate indifference to this obvious danger.

Dkt. 267 at 12.

The sixteen former DTC participants who seek to hold the Sheriff's Department legally responsible for their periods of incarceration at the Clark County Jail rely on the very same theory of liability, to wit, that the Sheriff's Department's policy of sending

weekly inmate rosters to the Clark County Courts was a policy of deliberate indifference, causing them to be detained for indefinite periods without the benefit of due process protections. This theory, however, is not available to these sixteen Plaintiffs as a basis for relief for their alleged harm.

Unlike Jesse Hash (as well as the plaintiffs in *Armstrong* and *Rovenstine*)*,* the sixteen former DTC participants who were detained at the Clark County Jail were not held on the basis of arrest warrants while awaiting their initial appearances. It is undisputed that, following their arrests (for those who were arrested), each of these Plaintiffs was brought before the DTC well within the 48 or 72-hour window required by the Indiana Code and the Fourteenth Amendment. *See* Ind. Code §§ 35-33-7-1, 35-33-2-2(a)(6).

The harm these Plaintiffs allegedly suffered was in being remanded to the Sheriff's custody and held pursuant to court orders which were issued as a result of decisions made during or immediately after DTC hearings, which they alleged failed to comport with the requirements of due process. Indeed, in responding to Sheriff Rodden's motion for summary judgment, Plaintiffs describe their deprivations of due process as follows:

> It is undisputed that Plaintiff suffered deprivations of their constitutional due process rights.
>
> Judge Jacobi testified that participants never received written warning of the allegations against them before sanctions of jail time were imposed at the status hearings. Judge Jacobi never gave a DTC participant an advisement of rights or re-advisement of rights when

> any DTC participant was given a sanction. Judge Jacobi testified that it was not DTC practice to advise a DTC participant of their right to have counsel. Judge Jacobi does not recall any situation where he or any other presiding DTC judge advised a participant that the court was considering a sanction and the DTC participant had the right to counsel. Judge Jacobi is not aware of ever appointing a legal counsel for a DTC participant prior to a petition to terminate being filed. DTC Director Susan Knoebel echoed Judge Jacobi's testimony, stating that she could not recall a time where the DTC presiding judge or anyone else in the courtroom asked a participant if they wanted legal assistance.

Pls.' Resp. at 23–24 [Docket No. 268].

Simply put, there is no claim by Plaintiffs, never mind evidence that the Sheriff's policy of sending the jail's weekly inmate roster to the court in any way caused Plaintiffs' alleged harm.  Unlike Hash, these Plaintiffs were not detained in the Clark County Jail because they were "lost in the shuffle"; rather, they were detained pursuant to court orders issued by the DTC judges before whom they had appeared.  Accordingly, Plaintiffs' reliance on our prior analysis and ruling is misplaced.  Regardless of its constitutionality, the jail's email policy did not cause Plaintiffs the harm they allege at the hand of the Sheriff.

The Supreme Court has repeatedly stated that in order to recover damages from a political subdivision such as the Sheriff's Department under § 1983 "a plaintiff must satisfy a 'rigorous' standard of causation; he must 'demonstrate a direct causal link between the [Department's] action and the deprivation of federal rights.'" *Connick v.*

*Thompson*, 563 U.S. 51, 75 (2011) (*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–405 (1997)).

Thus, to establish liability against Sheriff Rodden in his official capacity, Plaintiffs must identify some policy or custom (or lack thereof) promulgated and carried out by the Sheriff's Department which could have caused or prevented their alleged deprivations. *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) ("A governmental body's policies must be the *moving* force behind the constitutional violation before we can impose liability under *Monell*.") (emphasis in original).  Yet, Plaintiffs here have failed even in an attempt to identify a Sheriff's Department policy which might fit this requirement, positing only that "Sheriff Rodden's legal duties and responsibilities extend far beyond following orders…[and include] insuring that [detainees] are not warehoused [] for lengthy and indefinite periods of time without due process."  Dkt. 268 at 24.  We are unable to envision a policy by which the Sheriff's Department must ensure that its detainees receive the full complement of due process rights during courtroom proceedings without exceeding the boundaries of the Sheriff's lawful authority and encroaching upon the judiciary's role.  Judges are vested with authority to "[m]ake all proper judgments, sentences, decrees, orders, and injunctions," Ind. Code § 33-28-1-5(2), and the Sheriff must "execute all process directed to [him] by legal authority," *Id.* § 36-2-13-5, or otherwise subject himself to contempt. *Id.* § 33-28-15(4).  The due process deficiencies identified by Plaintiffs—to wit, the lack of written notice of the allegations against them, the lack of any advisement or re-advisement of rights, including the right to

counsel, the lack of notice that the DTC was considering sanctions, and the lack of appointed representation at the DTC hearings—exceed the scope of the Sheriff's statutory responsibilities.[13] Accordingly, Plaintiffs' official-capacity claims against the Clark County Sheriff's Department do not withstand summary judgment.

### II. Claims of Unlawful Arrest

The final group of Plaintiffs in this litigation are five former DTC participants, each of whom alleges that he/she was unlawfully arrested by Defendants Susan Knoebel and Jeremy Snelling, in violation of their Fourth Amendment rights.

### A. Claims by Michael Campbell, Amy Bennett, and Brandelyn Taylor

Plaintiffs Michael Campbell, Amy Bennett, and Brandelyn Taylor each admits to having absconded from the DTC Program at some point during his or her participation in 2012 and 2013, prompting arrest warrants to be issued by one of the DTC presiding judges. Thereafter, each was located at home or a place of residence by Defendants Knoebel and Snelling, who arrived at those locations in an unmarked, county-owned cruiser wearing badges and carrying firearms. Plaintiffs allege that, following his arrival, Snelling placed them in handcuffs, seated them in the back seat of the county vehicle, and transported them to the Clark County Jail. *See* Dkt. 270, Exs. 58, 66, 70.

---

[13] We note that Plaintiffs have not argued that, had they received sufficient due process at the DTC hearings, the length of their detentions (ranging from 6 to 220 days) would nevertheless have been unconstitutional under the Fourteenth Amendment, nor have they challenged the manner in which the Sheriff's Department carried-out the court's orders (it is undisputed that the Jail released each of these Plaintiffs when so ordered by the court).

These three Plaintiffs characterize these actions as unreasonable seizures, in violation of the Fourth Amendment, because, as a Circuit Court Bailiff and DTC Field Officer, Snelling had no state-granted authority to make arrests outside of the Clark County Courthouse, and, as a Probation Officer and DTC Director, Knoebel was without authority to effect an arrest.[14]

Defendants again have responded by asserting that they were acting in all respects under the direction of Judge Jacobi, who instructed them either off-the-record or out-of-court to attempt to locate those participants who had absconded from the program and for whom arrest warrants had been issued and to either voluntarily escort them to the Clark County Jail or to call local law enforcement officers to the scene to execute the arrest warrants and take them into custody.  Knoebel Decl. ¶ 17; Snelling Decl. ¶ 9.[15] Accordingly, Knoebel and Snelling contend that their actions were cloaked in quasi-judicial immunity, or, in the alternative, qualified immunity.

These claims and defenses are identical to those we previously addressed in *Hendrick v. Knoebel*, 2017 WL 1927729 (S.D. Ind. May 10, 2017). There, we explained that to be entitled to quasi-judicial immunity Defendants must show that they were acting

---

[14] Plaintiffs have not disputed that, as a Circuit Court Bailiff, Jeremy Snelling possessed authority to make arrests within the courthouse, and none of these Plaintiffs has alleged that Knoebel conducted the actual seizures by placing them in handcuffs and escorting them to the county-owned vehicle to be transported to jail.

[15] Defendants maintain that they followed Judge Jacobi's instructions by offering these Plaintiffs the option of declining to return with them, in which case local law enforcement officers would be enlisted to arrest them and take them to jail.  They concede that for purposes of summary judgment we must accept Plaintiffs' factual account—that when Knoebel and Snelling arrived, they asked them to place their hands behind their backs and escorted them to the county-owned vehicle without ever offering the alternative of being arrested by the Jeffersonville Police.

pursuant to a *valid* court order containing some indicia of authority. S*ee Id.* at, *7 (citing *Dunn v. City of Elgin*, 347 F.3d 641 (7th Cir. 2003)). Judge Jacobi's oral instructions, which were purportedly issued orally and informally, contained no such indicia of validity capable of conferring absolute immunity. *Id.* (citing *Schneider v. Cty. of Will, Ill.*, 528 F. App'x 590, 593 (7th Cir. 2013) (collecting cases)). In any event, we held that because Hendrick had challenged their claim to absolute immunity on factual grounds by contending that they acted in contravention of Judge Jacobi's alleged instructions to locate and voluntarily escort absconding DTC participants, the issue of quasi-judicial immunity could not be disposed of on summary judgment. *Id.* at, *7–8.

However, we also held that Defendants Knoebel and Snelling were entitled to qualified immunity because Hendrick had failed to show that, as of the time of his alleged arrest in September 2013, it was clearly established law that an extraterritorial seizure effected by a bailiff following the court's issuance of an arrest warrant violated the Fourth Amendment. *Id.* at, *10–11 (relying on *Pasiewicz v. Lake Cty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) and *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 648–49 (7th Cir. 2003)).

Plaintiffs here have presented no new facts, nor identified any new case law on this issue, nor sought a change in our analysis. We therefore import into this order the reasoning and conclusion laid out in our decision in *Hendrick*, 2017 WL 1927729 (S.D. Ind. May 10, 2017), holding that Defendants Knoebel and Snelling are entitled to summary judgment on the grounds of qualified immunity.

36

### B. Claims Robert "Bobby" Upton

Plaintiff Robert Upton alleges that, following his release from jail on July 25, 2012, he violated a no-contact order by picking up his girlfriend from her job and driving her home. When he pulled into her driveway, a police car pulled in behind him and DTC Director Susan Knoebel exited the car along with a Jeffersonville Police Officer, whom she instructed to place Upton under arrest and transport to the Clark County Jail. Upton Dep. at 40–45.

In responding to Defendants motion for summary judgment, Plaintiff Upton concedes that discovery has revealed that neither Knoebel nor Snelling took him into custody. Accordingly, he has abandoned his claim(s) against them. *See* Dkt. 270 at 54.

### C. Claims by Ashleigh Santiago

Plaintiff Ashleigh Santiago alleges that while attending a DTC Status hearing on May 16, 2013, she, along with several other DTC participants, were issued "short-term jail stay" sanctions by Judge Jacobi as punishment for testing positive for use of an illicit drug known as "Kratom." Bailiff Jeremy Snelling, along with several Clark County Jail officers, placed the participants in handcuffs and escorted them to the Clark County Jail. She claims that Snelling's actions constituted an unlawful arrest, in violation of the Fourth Amendment.

Snelling seeks summary judgment on the grounds that he is entitled to absolute immunity in having enforced Judge Jacobi's order to take her and the others into custody. Dkt. 228.

Santiago's rejoinder is succinct: "[T]here is no testimony that Judge Jacobi instructed Defendant Snelling to arrest persons inside the courtroom during the May 16, 2013 mass incarcerations for DTC participants for using kratom. For the reasons previously explained above regarding immunity for arrest, Defendant Snelling's motion should be denied." Dkt. 270 at 54.

Plaintiff Santiago's single-paragraph response to Snelling's motion is insufficient to create a genuine issue of material fact with regard to her Fourth Amendment claim against him. It is undisputed that Judge Jacobi ordered that the participants at the May 16, 2013 hearing, including Santiago, be taken into custody. *See* Dkt. 226-42; Santiago Dep. at 4; Snelling Decl. ¶ 25. It is also undisputed that Judge Jacobi instructed Snelling that, as his bailiff, he possessed powers of arrest in the courtroom. *See* Dkt. 226-10; Snelling Decl. ¶ 8; Jacobi Dep. at 213. "[B]ailiffs enjoy absolute quasi-judicial immunity for actions specifically ordered by the trial judge and related to the judicial function." *Martin v. Hendren*, 127 F.3d 720, 721 (8th Cir. 1997); *see also Schneider v. County of Will*, 366 Fed. App'x. 683 (7th Cir. 2010) (citing *Hendren* for extension of quasi-judicial immunity to bailiffs who cleared courtroom at judge's direction). Because Santiago has failed to respond with competent evidence or argument to Snelling's claim of absolute quasi-judicial immunity for carrying out Judge Jacobi's in-court order, we find that

38

Defendant Snelling is entitled summary judgment on Plaintiff Santiago's Fourth Amendment claim against him.

## <u>Conclusion</u>

In conclusion, we acknowledge Plaintiffs' pervasive, palpable frustration in waging this legal assault, which feeling arises out of their inability to overcome the central obstacle to their success, that is, the fact that the primary tortfeasor responsible for their constitutional deprivations was Clark Circuit Court Judge Jerome Jacobi acting in his role as the presiding judge of the Drug Treatment Court. In the course of our analysis and rulings on the various motions advanced in this litigation, we have found that the official-capacity claims against Judge Jacobi and his staff cannot support an award of monetary damages to Plaintiffs because those claims actually are suits against the State of Indiana. Likewise, we have held that neither Judge Jacobi's staff, the Clark County Board of Commissioners, nor the Clark County Sheriff can be held liable for the policies, procedures, and actions taken and implemented by Judge Jacobi.

We are far from unsympathetic to the situations in which Plaintiffs found themselves. Their detentions were in very many instances excessive, arbitrary, unwarranted and unjust. Nonetheless, our decisions here are grounded in the law's deep-rooted respect for the sovereignty of the States and the independence of the judiciary. These doctrines of immunity predate even our Constitution and have been enjoyed by sovereigns and judges for centuries as safeguards against the erosion of certain governmental powers and the capacity of such institutions to perform the duties entrusted

to them.  *See e.g., Chisholm v. Georgia*, 1 L.Ed. 440 (1793) (Iredell, J., dissenting) (surveying English practice); 1 W. Blackstone, Commentaries on the Laws of England 234–235 (1765).

The States possessed their sovereignty prior to the ratification of the Constitution and have retained it ever after.  *See Alden v. Maine*, 527 U.S. 706, 713 (1999).  Sovereign immunity serves as a constitutional limitation on the federal judicial power established in Art. III, barring federal courts from awarding damages against the state treasury, even when claims establish a violation of the Constitution.  *See Quern v. Jordan*, 440 U.S. 332 (1979); *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curiam).  "Few doctrine were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction."  *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967).  "This immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequences."  *Id.* at 554.

The practical effect of these well-established legal doctrines in this case is, of course, that most of the Plaintiffs cannot recover monetary damages to compensate them for their alleged injuries.  Ordinarily, they would not be entirely without a remedy.  In appropriate cases, state actors, including judges, may be subject to suit for prospective injunctive relief to enjoin their future unconstitutional practices from being committed in

40

their official capacities.  *Pulliam v. Allen*, 466 U.S. 522 (1984).  This avenue of relief

typically is available to a person confined by a state who seeks to challenge the fact or

duration of his confinement.  Here, however, such remedies are not available because,

following the reports of due process violations to the Indiana Judicial Center, the DTC

was decertified, the remaining participants were allowed to complete the Program under

the guidance of Chief Judge Carmichael, Judge Jacobi was removed from office (along

with several members of his staff), and the operations of the problem-solving court

officially ended in June 2015.

For the reasons explained above, Defendants' motions for summary judgment

[Docket Nos. 224, 225, and 230] are <u>GRANTED</u>.   Given our prior rulings [Docket Nos.

158, 164, 266, 267, 283, and 284], the only remaining claim in this litigation is the one

brought by Plaintiff Jesse Hash against Sheriff Danny Rodden in his official capacity

alleging a deprivation of his rights to due process under the Fourteenth Amendment.  *See*

Dkt. 267 at 16.  As explained above, Hash was not a participant of the DTC, which

makes his claim unique compared to all the others in this case in that they are directed

only at Sheriff Rodden based on his alleged unlawful detention in the Clark County Jail

prior to receiving an initial appearance.

Accordingly, having determined that Hash's claim is separate and distinct from the

other claims addressed and resolved in this entry (and those at Docket Nos. 158, 164,

266, 267, 283, and 284), and there being no just reason for delay, we hereby enter <u>FINAL</u>

<u>JUDGMENT</u> on all claims save those by Plaintiff Jesse Hash pursuant to Rule 54(b) of

the Federal Rules of Civil Procedure in Defendants' favor.  The adjudication of Plaintiff

Jesse Hash's surviving claims against Sheriff Rodden in his official capacity shall

proceed.

   **IT IS SO ORDERED.**


Date: _____7/27/2017_____                    _Sarah Evans Barker_____

                                             SARAH EVANS BARKER, JUDGE
                                             United States District Court
                                             Southern District of Indiana



Distribution to counsel of record via CM/ECF.